UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GARDEN CATERING - HAMILTON AVENUE, LLC, *et al.*, <br>     *Plaintiffs*, <br>          *v.* <br> WALLY'S CHICKEN COOP, LLC, *et al.*, <br>     *Defendants*. | Civil No. 3:11cv1892 (JBA) <br><br> February 28, 2014 |

## RULING ON DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT

Plaintiffs Garden Catering-Hamilton Avenue, LLC ("Garden Catering") and Frank J. Carpenteri, Sr. allege that former employee Defendant Michael Natale prepared to open a rival restaurant, Defendant Wally's Chicken Coop, LLC ("Wally's") while employed by Garden Catering, and in doing so, and in the subsequent operation of Wally's, (1) Defendant Natale breached his fiduciary duty to Garden Catering (Count One); (2) Defendants violated the Lanham Act, 15 U.S.C. § 1125(a) by this unfair competition (Count Two); (3) Defendants violated Connecticut common law prohibitions against unfair competition (Count Three); (4) Defendants violated the Connecticut Unfair Trade Practices Act ("CUTPA") (Count Four); and (5) Defendants were unjustly enriched (Count Five).  (*See* Compl. [Doc. # 1] ¶¶ 64–89.)

Defendants now move [Doc. # 68] for summary judgment on all counts.  For the reasons that follow, Defendants' motion is granted in part and denied in part.

## I.     Facts

Garden Catering, founded in Greenwich, Connecticut in 1977 and currently run by Plaintiff Frank J. Carpenteri, Sr. is a restaurant chain with multiple locations in

Connecticut and New York.  (Carpenteri, Sr. Aff., Ex. 17 to Pls.' Loc. R. 56(a)2 Stmt. [Doc. # 72] ¶¶ 5–8.)

Defendant Michael Natale worked at Garden Catering on an occasional part-time basis as a cashier from the 1990s until August 2011.  Starting in March or April 2011, Natale had a discussion with another Garden Catering employee, Philip Michael Pittocco, in which Natale expressed his interest in opening a restaurant in the Storrs area and asked Pittocco to look for an available space near the University of Connecticut campus.  (*See* M. Natale's Resp. to Pls.' 1st Req. for Admis. ("Natale Admis."), Ex. 5 to Pls.' 56(a)2 Stmt. ¶¶ 1, 2.)  During approximately the same period, Natale prepared a business plan and budget for his contemplated restaurant, communicated with Garden Catering's food supplier, U.S. Foods, Inc., and inquired about leasing a space for his restaurant in Storrs. (Lisa Natale Dep. Tr., Ex. 14 to Pls.' 56(a)2 Stmt. at 75–76, 89; Carpenteri, Jr. Decl., Ex. 19 to Pls.' 56(a)2 Stmt. ¶ 33.)

By June 2011, with his brother Jeffery Natale, who had also worked for Garden Catering on an occasional basis for a number of years, Defendant Natale had formed Wally's as a limited liability company in Connecticut and entered into a lease for what would become "Wally's Chicken Coop" at 134 North Eagleville Road in Storrs, Connecticut.  (Natale Admis. ¶¶ 1, 6–7.)  In July 2011, Defendant Natale signed a lease for a residential apartment in Tolland, Connecticut for himself, his brother, and another employee.  (M. Natale Dep. Tr., Ex. 10 to Pls.' 56(a)2 Stmt. at 228–31.)  In an early August 2011 meeting with a sales manager for Garden Catering's food supplier, U.S. Foods, Jeffrey Natale explained that Wally's would be "just like" Garden Catering.  (Dutton Decl., Ex. 23 to Pls.' 56(a)2 Stmt. ¶ 10.)  On August 8, 2011, Garden Catering's head fry

cook, Marcos Zuniga unexpectedly announced his intention to resign in two weeks. Zuniga had never previously shown signs of discontent and was initially evasive when Carpenteri, Jr. confronted him.  He later explained that Natale was opening a restaurant in Storrs, and had offered him a higher wage and room and board as an enticement to join.[1]  Up to that point, Natale had been able to keep his plans secret from Plaintiffs, and when Carpenteri, Jr., confronted him by telephone, he denied that he was planning to open a competing business.  Plaintiffs' attempts to convince Zuniga to remain at Garden Catering were initially successful, but ultimately he announced that he was leaving to join Defendants.  (Carpenteri, Jr. Decl. ¶¶ 22–29.)

Once Natale opened Wally's, Plaintiffs allege that he infringed a number of their trademarks.  Plaintiffs hold a registered trademark for the name and logo of "Garden Catering," and claim a number of common law trademarks:  "Bits" (for chicken nuggets), "Cones" (for battered and fried mashed potato balls), "the Hotsy" (referring to the various sandwiches topped with chili), "the Special" (a combination meal with half a pound of chicken nuggets, one side, and a soda), "the Junior Special" ("the Special" with a quarter pound of chicken), "the Boss Special" ("the Special" with a pound of chicken), and the "Homerun Special" (consisting of chicken nuggets with chili and cheese, a side and a

---

[1] Plaintiffs contend that both Zuniga and Defendant Natale were employed by Garden Catering at this point.  (*See* Carpenteri, Sr. ¶ 35.)  In Defendant Natale's Responses to Plaintiffs' Requests for Admissions, Defendant Natale denied without elaboration that both he and Zuniga were employed by Garden Catering at this time (*see* Natale Admis. ¶ 41), but Defendants have not submitted any evidence to rebut Plaintiffs' showing.

soda).  (Carpenteri, Sr. Decl. ¶¶ 11–12, 26.)  Plaintiffs claim that Wally's menu, marketing, and products have infringed these trademarks.

It is undisputed that Wally's refers to its chicken nuggets as "bits," offers "puds," which are identical to Garden Catering's "Cones," and offers two "Topsy" sandwiches, both of which are topped with chili.  (Wally's Resp. to Pls.' 1st Req. for Admis, Ex. 6 to Pls.' 56(a)2 Stmt. ¶¶ 9, 11.)  Wally's also offers several "combo" meals that track the "specials" offered by Garden Catering.[2]  "The Wally" is a medium portion of "chicken bits" and is available with small fries and a can of soda for an extra $1.  A smaller version of this combination is referred to as "The Mini" and larger versions are "The Mongo," and "The Husky."  (Wally's September 2011 Menu, Ex. 27 to Pls.' 56(a)2 Stmt.)

Wally's pricing tiers for its combination meals and sides correspond with the tiers offered by Garden Catering, and Wally's serves some of its orders in insulated bags similar to those used by Garden Catering.  (Wally's Admis. ¶¶ 18–22.)  Plaintiffs contend that these similarities have led customers to incorrectly conclude that there is an affiliation between Wally's and Garden Catering.  As evidence, it appends postings from Wally's Facebook page, that include various comments from members of the public linking the two, such as a user comment that "Anyone who likes Garden Catering, or who is looking to eat some great food for a great price needs to check out Wally's Chicken Coop."  Another posting stated "Thank god someone has brought the joy of GC to

---

[2] On one Facebook posting submitted by Plaintiffs, Wally's referred to the "Wally Special" rather than "combo."  (Wally's Chicken Coop Facebook Page, Ex. 1 to Pls.' 56(a)2 Stmt.; Wally's Admis. ¶ 5.)

Storrs." (Wally's Chicken Coop Facebook Page, Ex. 1 to Pls.' 56(a)(2) Stmt. at 1; Wally's Admis. ¶ 36–37.)

Defendants acknowledge that some customers have referenced "Garden Catering" while at Wally's, and Wally's employees have told customers that some of the food served by Wally's is similar to that served at Garden Catering. (Wally's Admis. ¶¶ 32–35.) For example, shortly after Wally's opened, a former Garden Catering employee visited Wally's at the direction of Carpenteri, Sr., and Pittocco told him that Wally's was "like Garden Catering, but we're better" and that the "Wally's Special" was the same as Garden Catering's "The Special." Natale said that "we are kinda like" Garden Catering. (Delisi Decl., Ex. 25 to Pls' 56(a)2 Stmt. ¶¶ 6, 8.)

Plaintiffs assert that Defendants have wrongfully appropriated their confidential business information and intellectual property in their operation of Wally's. As the owner of Garden Catering's registered and common law trademarks, Carpenteri, Sr. derives substantial revenue from selling licenses to use such intellectual property as well as from his own operation of Garden Catering restaurants and catering services. Plaintiffs assert that they have invested significant capital, time, and effort into the development of their brand, developing a reputation for high quality restaurants, and consumer goodwill. As a result, Garden Catering's trademarks and business information are extremely valuable assets. (*See* Carpenteri, Sr. Decl. ¶¶ 7–22.) Plaintiffs inform their employees that certain information is confidential, such as the manner in which its chicken nuggets are prepared, and require them to sign a confidentiality agreement.[3]

---

[3] There is no indication in the record that Defendant Natale signed such an agreement.

5

Certain of Plaintiffs' agreements with suppliers also include confidentiality provisions regarding information such as pricing terms. (*Id.* ¶¶ 31–34.)

Plaintiffs assert that Defendant Natale exhibited disloyalty and unfairly competed with them while he was still employed by Garden Catering when he recruited two of Plaintiffs' employees, developed a business plan using Garden Catering's confidential business information, met with its food distributor, and took all the necessary steps to incorporate and open up his competing venture.

## II.   Discussion[4]

Defendants contend that because Wally's is located approximately 104 miles away from Plaintiffs' store, and Plaintiffs hold no patents or other propriety protection on any of their menu items, they have not engaged in unfair competition. (Defs.' Mem. Supp. [Doc. # 68-2] at 2–3.) Plaintiffs contend that that Defendants' admitted sales of similar products "conclusively establish" Plaintiff's liability under the Lanham Act and unfair competition under both Connecticut common law and CUTPA. (Pls.' Opp'n [Doc. # 71]

---

[4] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

at 10.)  Although Plaintiffs have not cross-moved for summary judgment, they "request that the Court grant them summary judgment *sua sponte*."  (*Id.* at 11.)

A.    **Local Rule 56**

Plaintiffs contend that Defendants are not entitled to summary judgment because they have failed to comply with the requirements of Local Rule 56.  That rule requires that a party moving for summary judgment must submit a "Local Rule 56(a)1 Statement," which sets forth "a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried," D. Conn. Loc. R. 56(a)1, "followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial," Loc. R. 56(a)3.  Failure to comply with the "specific citation" requirement "may result in the Court deeming certain facts that are supported by the evidence admitted in accordance with Rule 56(a)1 or in the Court . . . denying the motion for summary judgment."  *Id.*

Defendants contend that they are not able to comply with the "specific citation" requirement for each asserted undisputed fact because their motion relies upon "the *non-existence* of certain facts that Plaintiffs would need to prove in order to prevail" at trial. (Defs.' Loc. R. 56(a)1 Stmt. [Doc. # 68-1] at 1.)  Plaintiffs, acknowledging their burden of proof at trial and that "Defendants' burden under Rule 56 may be satisfied if they can point to an absence of evidence to support an essential element of Plaintiffs' claims," contend that Defendants cannot satisfy their burden on summary judgment by merely

asserting that Plaintiffs have submitted no evidence without submitting evidence of their own.[5]  (Pls.' Opp'n at 4.)

In *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the Supreme Court addressed a moving party's burden on summary judgment where the party opposing summary judgment ultimately bears the burden of proof at trial.  The plaintiff brought a wrongful death action charging that the death of her husband resulted from exposure to asbestos products manufactured by the defendants.  The defendants moved for summary judgment on the grounds that after discovery, the plaintiff had failed to produce any evidence of exposure to the defendants' products, a necessary element to prevail at trial. The district court granted summary judgment on this basis, but the court of appeals reversed, concluding that the motion was rendered "fatally defective" by the fact that petitioner "made no effort to adduce *any* evidence, in the form of affidavits or otherwise, to support its motion."  *Id.* at 321.

The Supreme Court reversed, concluding that "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323 (quoting

---

[5] Defendants submitted only two items of evidence in support of their motion: a declaration from Defendants' former business partner attesting that Garden Catering did not undertake to keep its food preparation methods confidential (*see* Marini Decl., Ex. 1 to Defs.' Loc. R. 56(a)1 Stmt., and a printout from Google Maps showing that Garden Catering and Wally's are located 104 miles apart (*see* Google Maps Printout, Ex. 2 to Defs.' 56(a)1 Stmt.).

the then-operative version of Fed. R. Civ. P. 56(c)).  But the Supreme Court held there was "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.*

Although *Celotex* establishes that Defendants need not adduce evidence to negate Plaintiffs' claims, it does not support Defendants' position that no showing at all is required to prevail.  Local Rule 56 reflects the requirement embodied by the Federal Rules of Civil Procedure that summary judgment is appropriate where "the movant *shows* that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added).  Federal Rule 56(c) requires that factual positions be supported by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  Where, as here, a defendant seeks to show that a plaintiff cannot sustain its burden at trial, the defendant's burden on summary judgment "will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.

In *Celotex*, the defendants showed their entitlement to summary judgment by pointing to an interrogatory response which demonstrated that the plaintiff would be unable to produce evidence necessary to prevail at trial.  Given the extensive discovery conducted in this case, the fact that Defendants seek to establish the absence of Plaintiffs'

proof does not relieve them from complying with Local Rule 56's "specific citation" requirement.  For example, as discussed *infra*, Defendants contend that Plaintiffs cannot meet their burden of establishing that the term "Bits" is a protected mark because Plaintiffs have not actually used this mark.  In their memorandum of law, Defendants describe deposition testimony in which Garden Catering's corporate representative reportedly "couldn't say with certainty" whether it had ever used the term.  (Defs.' Mem. Supp. at 15.)  However, in their Rule 56(a)1 Statement, Defendants neither cited to the deposition transcript nor proffered a copy of the deposition transcript, nor did they provide an explanation for their failure to do so.[6]  (*See* Defs.' 56(a)1 Stmt. ¶ 10.)

The consequence of failing to comply with Local Rule 56 is that Defendants do not avail themselves of the opportunity to contribute to the factual record, and the Court can deem facts submitted by Plaintiffs and supported by evidence as admitted.  *See* Loc. R. 56(a)3.  Sanctions can also be imposed at the Court's discretion, but contrary to Plaintiffs' contention at oral argument, the Court is not obligated to deny the motion.  *Id.*; *see also Tross v. Ritz Carlton Hotel Co., LLC*, 928 F. Supp. 2d 498, 503 (D. Conn. 2013) ("In this Circuit, a movant's failure to comply with a district court's relevant local rules on a motion for summary judgment permits, but does not require, a court to dispose of that motion.").

Further, as the Fifth Circuit explained in a case cited by Plaintiffs, although "a mere conclusory statement that the other side has no evidence" is insufficient to shift the

---

[6] As discussed at note 5 *supra*, Defendants submitted only two items of evidence in support of their motion, neither of which was relevant to the question of whether the "Bits" mark was protectable under the Lanham Act.

burden "to the plaintiffs to go beyond the pleadings to show specific facts creating a genuine issue for trial," *Ashe v. Corley*, 992 F.2d 540, 544 (5th Cir. 1993), summary judgment can still be granted in some instances.  Here, for example, although Defendants' failure to satisfy their initial burden of production on summary judgment may have relieved Plaintiffs of their burden to produce evidence demonstrating a genuine issue for trial, Plaintiffs have submitted evidence in opposition, which will be considered.  *See Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 57 (2d Cir. 2012) ("In ruling on a motion for summary judgment, the district court may rely on any material that would be admissible at a trial," and "it must consider all of the evidence in the record." (internal citations and quotation marks omitted)); *see also United States v. Houston Pipeline Co.*, 37 F.3d 224, 227 (5th Cir. 1994) ("Rule 56 clearly permits a court to consider the whole record, and not just the portion highlighted by the motion itself." (internal quotation marks omitted)).[7]

---

[7] There are also instances where "a summary-judgment motion may be made on the basis of the pleadings alone, and if this is done it functionally is the same as a motion to dismiss for failure to state a claim or for a judgment on the pleadings."  10A Wright & Miller, *Fed. Prac. & Proc. Civ.* § 2713 (3d ed. 2013).  Summary judgment is appropriate if "accepting all alleged facts as true, the plaintiffs' complaint nonetheless failed to state a claim."  *Ashe*, 992 F.2d at 544.

**B.      Lanham Act:  Unfair Competition**

Section 43(a) of the Lanham Act provides:

Any person who, on or in connection with any goods or services, or any
container for goods, uses in commerce any word, term, name, symbol, or
device, or any combination thereof, or any false designation of origin, false
or misleading description of fact, or false or misleading representation of
fact, which—

> (A) is likely to cause confusion, or to cause mistake, or to deceive
> as to the affiliation, connection, or association of such person with
> another person, or as to the origin, sponsorship, or approval of his
> or her goods, services, or commercial activities by another person,
> or
>
> (B) in commercial advertising or promotion, misrepresents the
> nature, characteristics, qualities, or geographic origin of his or her
> or another person's goods, services, or commercial activities,
> shall be liable in a civil action by any person who believes that he or
> she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

Section 43(a) "confer[s] protection against a myriad of deceptive commercial

practices" and "provides for two distinct causes of action: false designation of origin or

source, known as 'product infringement,' and false description or representation, known

as 'false advertising.'"  *Res. Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.*,

926 F.2d 134, 139 (2d Cir. 1991).  Plaintiffs assert both causes of action.  (*See* Compl.

¶ 71.)

"To prevail on a trademark infringement and unfair competition claim . . . in

addition to demonstrating that the plaintiff's mark is protected, the plaintiff must prove

that the defendant's use of the allegedly infringing mark would likely cause confusion as

to the origin or sponsorship of the defendant's goods with plaintiff's goods." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009).

At oral argument, Plaintiffs confirmed that only four of their claimed marks are relevant to this case:   the name and logo "Garden Catering," which is a federally registered mark; and four unregistered marks: (1) "Bits" (for chicken nuggets); (2) "Cones" (for battered and fried mashed potato balls); (3) "the Hotsy" (for various sandwiches with chili); and (4) "The Special," and related terms such as "The Junior Special," "The Big Boy Special," and "The Boss Special" (all referring to combination meals with a side, soda, and varying contents of chicken).

### 1.    *"Garden Catering" and "Cones"*

Garden Catering acknowledged that Defendants had not directly used the "Garden Catering" or "Cones" marks, but claimed that Defendants infringed their marks by creating a restaurant with the same overall impression as Garden Catering and with their marketing and statements to customers, such as the statement that Wally's was "like Garden Catering, but we're better."[8]  (Delisi Decl. ¶¶ 6, 8.)

Plaintiffs' argument reflects an overly broad view of what is protected by the Lanham Act.  A "trademark is 'not property in the ordinary sense,' but only a word or symbol indicating the origin or source of a product.  The owner of the mark acquires the right to prevent his goods from being confused with those of others and to prevent his own trade from being diverted to competitors through their use of misleading marks. 'There are no rights in a trade-mark beyond these.'" *Pirone v. MacMillan, Inc.*, 894 F.2d

---

[8] Defendants don't assert that Plaintiffs made any statements regarding "Cones."

579, 581 (2d Cir. 1990) (quoting *Indus. Rayon Corp. v. Dutchess Underwear Corp.*, 92 F.2d 33, 35 (2d Cir. 1937)).  Thus, Plaintiffs' trademark in "Garden Catering" confers upon it a limited property right to prevent other businesses from using "any word, term, name, symbol, or device," 15 U.S.C. § 1125(a), that infringes this mark, but it does not encompass all forms of competition or unfair trade practices.

Plaintiffs compare their claims to those in *Invicta Plastics (USA) Ltd. v. Mego Corp.*, 523 F. Supp. 619, 623 (S.D.N.Y. 1981), in which the district court held that the defendant, who used the mark Sixth Sense as the title of a game, had infringed on the plaintiff's mark in Mastermind by numerous statements made on its packaging, such as that Sixth Sense was created by "the inventor of MASTERMIND."  Although the defendant's mark was not confusingly similar to the plaintiff's mark and the statements were truthful, the court found that the defendant was "deliberately seeking to use the goodwill plaintiff has acquired in its success with MASTERMIND to sell its own product."  *Id.*

However, this determination alone was not sufficient to impose liability under the Lanham Act.  Rather, liability was imposed on the basis of a likelihood of consumer confusion arising from the defendant's use of the plaintiff's mark in statements made on the Sixth Sense packaging.  The court explained that "a glance at the SIXTH SENSE box would leave [consumers] confused as to who made either SIXTH SENSE or MASTERMIND.  That is, consumers might believe that [the defendant] was also the producer of MASTERMIND, or that the producers of MASTERMIND also made SIXTH SENSE."  *Id.*  Unlike in *Invicta Plastics*, Plaintiffs seek to prove liability on the basis of consumer confusion that may result from Defendants' oral statements regarding Wally's

self-proclaimed similarity to Garden Catering, rather than connecting the likelihood of that consumer confusion to Defendants' use of a mark.

Even if, as Plaintiffs contend, Wally's "has likewise deliberately attempted to connect its new business venture with that of Garden Catering, a well-established, highly successful business" to capitalize on Garden Catering's goodwill (Pls.' Opp'n at 21), such a claim is based on Defendants' business practices as opposed to its infringement of Plaintiffs' marks, and is not actionable under the Lanham Act.  While, as discussed *infra*, Plaintiffs' claims under state business tort law may provide a remedy for a broad range of unfair business practices, the Lanham Act focuses only on a subset of these claims related to the use of marks.  *See United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918) ("The law of trade-marks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his."); *see also EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 63 (2d Cir. 2000) ("Trademark law is concerned with protection of the symbols, elements or devices used to identify a product in the marketplace and to prevent confusion as to its source.  It does not protect the content of a creative work of artistic expression as a trademark for itself.").  In short, Defendants' comparisons of Wally's to Garden Catering do not constitute "use" of Plaintiffs' marks in in violation of the Lanham Act.

2.    *"Bits"*

Plaintiffs' claim to protected rights in the term "bits" also seeks a broader measure of relief than is available under the Lanham Act.  Defendants contend that Plaintiffs have

long "referred to the pieces of battered, fried chicken breast that Garden Catering sells as 'Nuggets,'" while Defendants have used a different term—"Bits"—to refer to what is indisputably a similar product.  (Defs.' Mem. Supp. at 14.)  As Defendants note, although Plaintiffs claim that they own rights to the term "Bits," they have produced no evidence that Garden Catering has ever used this term.  "Unlike patent law, rights in trademarks are not gained through discovery or invention of the mark, but only through actual usage. . . .  No trademark rights accrue to someone who merely selects a designation without actual use of it in the advertising or sale of goods."  2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16:11 (4th ed. 2013) ("*McCarthy on Trademarks*").

The only evidence in the record to support Plaintiffs' claimed use of the term "Bits" is Carpenteri, Sr.'s broad and partially conclusory assertion that "this mark was originally used by Garden Catering in the 1980s and continues to be used today by Garden Catering and its customers" and "is known by the public as being associated with Garden Catering."  (Carpenteri, Sr. Decl. ¶ 21.)  This assertion is specifically refuted by Garden Catering's menu, which actually refers to its chicken pieces as "nuggets," not "Bits" (*see* Garden Catering Menu, Ex. 10 to Pls.' 56(a)2 Stmt.)  Thus, Plaintiffs lack any competent evidence establishing their use of the term "bits."  *See Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008) ("A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory, or based on speculation." (internal citations omitted)).  Without evidence of use, Plaintiffs cannot establish a trademark on that term even if it were sufficiently distinctive to warrant protection.  *See Blue Planet*

*Software, Inc. v. Games Int'l, LLC*, 334 F. Supp. 2d 425, 437 (S.D.N.Y. 2004) ("[T]rademark rights attach based upon use of the mark in commerce.").

      3.      *"The Special" and "The Hotsy"*

To prevail on their claims that Defendants infringed the marks "the Special" and "the Hotsy," Plaintiffs must establish that these unregistered marks were entitled to protection. "An unregistered mark is entitled to protection under the Lanham Act if it would qualify for registration as a trademark. To qualify for registration a mark must be sufficiently 'distinctive' to distinguish the registrant's goods from those of others." *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 381 (2d Cir. 2005) (internal citations omitted). There are four categories of marks subject to varying degrees of protection under the Lanham Act: (1) generic terms, which are not protected; (2) descriptive terms, which are protected only with proof of secondary meaning; (3) suggestive terms; and (4) arbitrary or fanciful terms. *See PaperCutter, Inc. v. Fay's Drug Co., Inc.*, 900 F.2d 558, 561–62 (2d Cir. 1990).

      a)      *"The Special"*

"A generic term is one that refers, or has come to be understood as referring, to the genus of which the particular product is a species." *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976). "It is a bedrock principle of the trademark law that no trader may acquire the exclusive right to the use of a term by which the covered goods or services are designated in the language. Such a term is 'generic.' Generic terms are not eligible for protection as trademarks; everyone may use them to refer to the goods they designate." *Otokoyama Co. Ltd. v. Wine of Japan Imp., Inc.*, 175 F.3d 266, 270 (2d Cir. 1999).

Plaintiff's use of the term "Special" when referring to a combination platter of food with a main course, side dish, and a soda is generic.  Restaurants have long used this term to refer to a bundling of food products offered at a reduced price.  *See, e.g.,* James Augustine Aloysius Joyce, *Dubliners* (1st ed. 1914) 115 ("They went into the parlour at the back and O'Halloran ordered small hot specials all round.").  The common usage of a term can indicate whether it is generic.  *See, e.g, E. Air Lines, Inc. v. New York Air Lines, Inc.*, 559 F. Supp. 1270, 1274 (S.D.N.Y. 1983) (holding that the term "shuttle" to refer to short-haul flight is generic, because the "meaning of the words 'shuttle' and 'air-shuttle' demonstrates that these terms indisputably describe the nature and class of transportation service that EAL provides and the terms are therefore generic"); *see also Miller Brewing Co. v. G. Heileman Brewing Co., Inc.*, 561 F.2d 75, 81 (7th Cir. 1977) (holding that "the common descriptive word 'light'" is generic when referring to beer).

Even if "the Special" were to enjoy some protection, Wally's has not generally used the term "Special," instead referring to its meals as "combos" on its menu (*see* Wally's September 2011 Menu), although one Facebook posting referred to the "Wally's Special" (*see* Wally's Chicken Coop Facebook Page, at 1).  Further, Plaintiffs have not presented any evidence that appending variations to "the Special," such as "Junior," "Big Boy," and "Boss" make the terms sufficiently distinctive to warrant protection nor that Wally's marks, such as the "The Wally," "The Mini," "The Mongo," and "The Husky" are confusingly similar.

> b)      *"Hotsy"*

The parties dispute whether the term "Hotsy" is a suggestive term, or a descriptive term requiring proof of a secondary meaning.  The Second Circuit has recognized that

the line between these two categories is "chimerical" and "often illusory," *Thompson Medical Co., Inc. v. Pfizer, Inc.,* 753 F.2d 208, 213 n.8, 215 (2d Cir. 1985), and thus determination of the proper classification of "Hotsy" should be left for a jury to decide, *see Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999) ("The classification of a mark is a factual question.")  However, to survive summary judgment Plaintiffs must also demonstrate a sufficient evidentiary basis for a jury to conclude that there exists "'a probability of confusion, not a mere possibility,' affecting 'numerous ordinary prudent purchasers.'"  *Star Indus., Inc.*, 412 F.3d at 383 (quoting *Gruner Jahr USA Pub., a Div. of Gruner Jahr Printing & Pub. Co. v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir. 1993)).  "Likelihood of confusion includes confusion of any kind, including confusion as to source, sponsorship, affiliation, connection, or identification. In order to be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market.  The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement."  *Id.* at 383–84 (internal citations and quotation marks omitted).[9]

Plaintiffs do not contend that their "Hotsy" is so similar to Wally's "Topsy" that consumers will be unable to differentiate between the two.  *Cf. LaTouraine Coffee Co. v. Lorraine Coffee Co.*, 157 F.2d 115, 117 (2d Cir. 1946) (holding that the name Lorraine

---

[9] In response to a cease and desist letter sent to Defendants before this litigation commenced, Defendants have since stopped using the term "Topsy."  (*See* Ltr. James C. Riley to M. Natale, Sept. 13, 2011, Ex. 10 to Pls.' 56(a)2 Stmt.)  Although the parties disagree as to when Defendants stopped using this term (*compare* Defs.' Mem. Supp. at 17, *with* Pls.' Opp'n at 16), this dispute is immaterial as to liability under the Lanham Act, as Plaintiffs may recover for past damages irrespective of current use, *see* 15 U.S.C. § 1117(a).

used by the defendant was confusingly similar with the plaintiff's LaTouraine brand, both used to sell coffee and tea, because "[t]he initial letters and the last syllables—probably the parts of any word which impress themselves most firmly upon the memory—are identical. . . . . Except on the tongues of precisionists, both sound alike; both are unmistakably French.").   Rather than asserting that consumers were confused into believing that "Hotsy" and "Topsy" were the same product, Plaintiffs assert an affiliation confusion claim:  that as a result of Defendants' use of their imitative term, "consumers were likely to be confused into believing that there was an affiliation, sponsorship, or other connection between the companies' products."  *Star Indus., Inc.*, 412 F.3d at 384.

In determining whether there is a likelihood of consumer confusion, courts apply the eight-factor balancing test developed in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961) evaluating:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

*Starbucks Corp.*, 588 F.3d at 115.

The application of this test is "not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused."  *Id.* (quoting *Star Indus., Inc.*, 412 F.3d at 384).  "The district court's resolution of each separate factor is treated as a finding of fact . . . , while its balancing of the factors is treated as a matter of law."  *Star Indus., Inc.*, 412 F.3d at 384.  Although factual

determinations are involved in the *Polaroid* analysis, "courts retain an important authority to monitor the outer limits of substantial similarity within which a jury is permitted to make the factual determination whether there is a likelihood of confusion as to source, and summary judgment is appropriate if the court is satisfied that the products or marks are so dissimilar that no question of fact is presented." *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 116 (2d Cir. 1984) (internal citations and quotation marks omitted).

Plaintiffs rely primarily on evidence of consumers making connections between Wally's and Garden Catering to demonstrate actual consumer confusion without any showing of consumer confusion specifically relating to the mark "Hotsy" for which they claim protection. Even if evidence of consumer confusion between Wally's and Garden Catering in general were sufficient, Plaintiffs' evidence of "affiliation confusion" is anecdotal. For example, Carpenteri, Jr. asserts that customers have come into Garden Catering asking for a "Wally's Special" or have said that "it is great to hear that Garden Catering is up at UCCON."[10] (Carpenteri, Jr. Decl. ¶¶ 41–43.) Plaintiffs also cite postings on Facebook and Twitter that suggest that consumers incorrectly concluded that the two

---

[10] Such statements are admissible either as non-hearsay, because they are not offered to prove the truth of the matter asserted, or under the hearsay exception for then-existing state of mind. *See Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1003–04 (2d Cir. 1997) ("The testimony in question was not offered to prove that Fun–Damental was actually selling to some retailers at lower prices, but was probative of the declarant's confusion. Further, Federal Rule of Evidence 803(3) allows statements, otherwise excluded as hearsay, to be received to show the declarant's then-existing state of mind.").

restaurants were associated, such as "there's a garden catering at uconn" and "Wally's chicken coop=garden catering."[11] (Twitter Posts, Ex. 21 to Pls.' 56(a)2 Stmt. at 1, 5.)

Such anecdotal evidence of "consumer confusion" about whether Garden Catering's restaurant is affiliated with Wally's in some way is not sufficient.[12] *See Universal City Studios, Inc.*, 746 F.2d at 118 n.8 ("We do not doubt that there are some consumers who believe that the producers of Donkey Kong and of King Kong are the same. However, the fact that there may be a few confused consumers does not create a sufficiently disputed issue of fact regarding the likelihood of confusion so as to make summary judgment improper."); *see also Lang v. Ret. Living Pub. Co., Inc.*, 949 F.2d 576, 582-83 (2d Cir. 1991) (affirming summary judgment where 400 misdirected phone calls "obviously reflect some sort of confusion," but "no evidence links the confusion evinced by the calls to any potential or actual effect on consumers' purchasing decisions").

---

[11] At oral argument, Defense counsel suggested that consumers making such comments were not actually confused but rather were aware of the dispute between Plaintiffs and their former employees at Wally's and were trying to provoke Plaintiffs.

[12] In any event, a number of the postings in fact demonstrate that consumers were not confused regarding the affiliation between the two restaurants, such as "Wally's stole [Garden Catering's] recipe," "Wally coops is a knock off from them," and "go to garden catering, it's the same thing, that's where Wally's got the idea from." (Twitter Posts at 6–7, 9.)

Plaintiffs have submitted evidence that they contend proves Defendants' intentional copying of Plaintiffs' business model in general, and gives rise to a presumption of a likelihood of confusion."[13]  *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987).  But Plaintiffs' evidence on this factor is outweighed by the absence of evidence on the other *Polaroid* factors, which Plaintiffs have not addressed.  As Defendants note, the third *Polaroid* factor—proximity of the products and their competitiveness with one another—cuts strongly against Plaintiffs given that Wally's and Garden Catering are located over 100 miles apart, and the record does not show that Plaintiffs had protected marks that were distinctive in the local Storrs market.  These shortcomings in Plaintiffs' evidence of the likelihood of consumer confusion leave no question of fact for a jury to determine, and Plaintiffs' Lanham Act unfair competition claims fail.

---

[13] Although the Lanham Act "extends protection to a product's 'trade dress'—the total image of a good as defined by its overall composition and design, including size, shape, color, texture, and graphics," *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 168 (2d Cir. 1991), Plaintiffs have not asserted such a claim.  A trade dress claim requires a specific and detailed description of the elements of a product's design that a party contends merits production.  Without this showing, a court will be unable to evaluate such a claim.  *See Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997) ("Without such a precise expression of the character and scope of the claimed trade dress, litigation will be difficult, as courts will be unable to evaluate how unique and unexpected the design elements are in the relevant market.  Courts will also be unable to shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves protection.").

## C.      Lanham Act:  False Advertising

Plaintiffs also assert that Defendants' various comments to customers that Wally's was "just like" or "similar to" Garden Catering constitutes false advertising.  This claim fails as a threshold matter, because Plaintiffs do not demonstrate that there is any actionable advertisement.  "[A]lthough representations less formal than those made as part of a classic advertising campaign may suffice, they must be disseminated sufficiently to the relevant purchasing public."  *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 56 (2d Cir. 2002).  Normally, plaintiffs must demonstrate "widespread dissemination within the relevant industry" and "businesses harmed by isolated disparaging statements do not have redress under the Lanham Act; they must seek redress under state-law causes of action."  *Id.* at 57.  At oral argument, Plaintiffs confirmed that the only "advertisements" that they challenge are Defendants' comments to customers visiting Wally's, which cannot constitute actionable advertisements.  Plaintiffs' false advertisement claim therefore fails.[14]

## D.      Remaining State Law Claims

Where, as here, a federal court has dismissed before trial the only basis for federal jurisdiction, it has discretion under 28 U.S.C. § 1367(c) to either retain or decline jurisdiction over the remaining state law claims.  *See Osborn v. Haley*, 549 U.S. 225, 245 (2007) ("Even if only state-law claims remained after resolution of the federal question, the District Court would have discretion, consistent with Article III, to retain

---

[14] Further, Defendants' comments to the effect that Wally's was like Garden Catering, but better (Delisi Decl. ¶ 6), were neither false nor misleading, as the restaurants were indisputably similar, and the question of which restaurant was "better" was a statement of opinion.

24

jurisdiction.").  A "federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* at 350 n.7.

However, here "the dismissal of the federal claim occur[red] late in the action, after there has been substantial expenditure in time, effort, and money in preparing the dependent claims, knocking them down with a belated rejection of supplemental jurisdiction may not be fair.  Nor is it by any means necessary." *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994) (internal quotation marks omitted).  Given that the parties have already completed discovery and are ready to proceed to trial, the Court concludes that it would be more efficient, convenient and fair to the parties to retain supplemental jurisdiction rather than requiring them to start anew in state court.  *See Raucci v. Town of Rotterdam*, 902 F.2d 1050, 1055 (2d Cir. 1990) ("We find . . . that denial of pendent jurisdiction here would be a waste of judicial resources, given the extensive proceedings involving the pendent claims prior to the dismissal of the federal claim.").  This conclusion is especially warranted in light of the fact that both parties are smaller businesses with an ongoing dispute, and they are in particular need of a prompt

adjudication.  Additionally, the state law claims do not involve novel questions of state law, which considerations of comity would dictate leaving to state court determination, *see id.* ("This case merely applies recently settled New York municipal liability doctrine and does not involve novel legal questions."), and the remaining state law claims are largely based on the same nucleus of facts as the federal claims that the Court has already examined.

1.  *Breach of Fiduciary Duty (Count One)*

Plaintiffs allege that Defendant Natale breached "the fiduciary duties of loyalty and honesty" by competing with Garden Catering while he was still an employee. (Compl. ¶ 65.)  In order to assert that Natale breached a fiduciary duty to Garden Catering, Plaintiffs must necessarily establish the existence of a fiduciary relationship between the parties.  *See Ostrowski v. Avery*, 243 Conn. 355, 361 (1997).  The Connecticut Supreme Court has deliberately declined to define "a fiduciary relationship in precise detail and in such a manner as to exclude new situations."  *Konover Dev. Corp. v. Zeller*, 228 Conn. 206, 223 (1994) (quoting *Harper v. Adametz,* 142 Conn. 218, 225 (1955)).

It has "instead chosen to leave 'the bars down for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other.'"[15] *Dunham v. Dunham*, 204 Conn. 303, 320 (1987) (quoting *Harper*, 142 Conn. at 225).

In *Town & Country House & Homes Serv., Inc., v. Evans*, 150 Conn. 314, 317 (1963), the Connecticut Supreme Court held that an employee of a house cleaning business breached his fiduciary duty to his employer by soliciting his employer's customers during the course of his employment. While cleaning the homes of the plaintiffs' customers, the defendant informed them that he planned to start his own business. *Id.* at 316. The trial court had rejected a claim for breach of fiduciary duty against the employee, concluding "that the relationship between the parties was the

---

[15] Courts in other states employing this common-law definition of a fiduciary relationship have concluded held that low-level at-will employees do not owe a fiduciary duty to their employers. *See TalentBurst, Inc. v. Collabera, Inc.*, 567 F. Supp. 2d 261, 266 (D. Mass. 2008) ("[T]he duty of loyalty does not extend to 'rank-and-file' employees under Massachusetts law, absent special circumstances indicating they held a position of 'trust and confidence.'"); *W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 16 (Mo. 2012) ("This Court declines to extend the law of fiduciary duty . . . to include at-will employees who are not constrained by a non-compete agreement."); *Atlanta Mkt. Ctr. Mgmt., Co. v. McLane*, 269 Ga. 604, 607 (1998) ("The employee-employer relationship is not one from which the law will necessarily imply fiduciary obligations; however, the facts of a particular case may establish the existence of a confidential relationship between an employer and an employee concerning a particular transaction, thereby placing upon the parties the fiduciary obligations associated with a principal-agent relationship.").

Other courts have held that low-level employees may owe fiduciary duties to their employers but the nature and scope of such duties are more limited than those owed by managerial and executive employees. *See, e.g., Cameco, Inc. v. Gedicke*, 157 N.J. 504, 516 (1999) ("The scope of the duty of loyalty that an employee owes to an employer may vary with the nature of their relationship. Employees occupying a position of trust and confidence, for example, owe a higher duty than those performing low-level tasks.").

ordinary one of employer and employee."  The Connecticut Supreme Court reversed, holding that "[t]he defendant, as an agent of the plaintiff, was a fiduciary with respect to matters within the scope of his agency.  The very relationship implies that the principal has reposed some trust or confidence in the agent and that the agent or employee is obligated to exercise the utmost good faith, loyalty and honesty toward his principal or employer."  *Id.* at 316–17.  The court did not address the element of resulting superiority and influence required to establish a fiduciary relationship.

Connecticut courts have read *Town & Country House & Homes Serv.* to establish that by virtue of the employment relationship an employee owes his or her employer a fiduciary duty.  In *Charter Oak Lending Grp., LLC v. August*, 127 Conn. App. 428, 431 (2011), the plaintiff, a mortgage broker and lender, asserted a claim for breach of fiduciary duty against former employees who worked as mortgage specialists or loan originators and who accepted employment with a competitor and allegedly provided that competitor with the plaintiff's confidential information before resigning.  The trial court rejected a claim for breach of fiduciary duty, declining to equate the parties' principal-agent relationship with a fiduciary relationship.  *Id.* at 440.  The Appellate Court of Connecticut reversed, holding that a principal-agent relationship was sufficient on its own to establish an employee's fiduciary duty.  *See id.* at 441 ("An agent is a fiduciary with respect to matters within the scope of his agency." (quoting *Taylor v. Hamden Hall School, Inc.,* 149 Conn. 545, 552 (1962)).  In *Miller Foods, Inc. v. Schubert-Loughran*, No. CV020815760S, 2009 WL 1688344 (Conn. Super. Ct. May 20, 2009), the Superior Court, noting that although an action for breach of fiduciary duty normally requires that the plaintiff prove the existence of a fiduciary duty, read *Town & Country House & Homes*

*Serv.* as equating proof of an agency relationship with that of a fiduciary relationship. *See Miller Foods*, 2009 WL 1688344, at *3 n.3 ("[A]n agent or employee is a fiduciary by virtue of finding an agency or employment relationship, seemingly, without more.").

Connecticut case law, however, limits any fiduciary duty owed to an employer "to matters within the scope of his agency," and the employee "is not in a fiduciary relation to his principal . . . in matters in which he is not employed, unless the nature of the agency is such as to create a confidential relation in all matters." *Taylor*, 149 Conn. at 552. In *Taylor*, a private school alleged that its former headmaster breached his fiduciary duty of loyalty to the school when he "secretly purchased" a mortgage note that the school had executed without disclosing his financial interest to the school. *Id.* In a foreclosure action brought against the school on the note by the headmaster's widow, the school asserted as a special defense that the headmaster had breached his fiduciary duty to the school with his undisclosed purchase. *Id.* at 548. The Connecticut Supreme Court affirmed the trial court's rejection of this defense, because there was no indication of "the nature of Taylor's duties or the extent of his agency as headmaster," and the school had only established that it "reposed faith and confidence in him in matters within the scope of his duties as headmaster, to the exclusion of any general confidential relationship and that the duties of headmaster did not include the school's real estate dealings." *Id.* at 552.

In this case, the record contains only minimal facts regarding the nature and scope of Natale's employment relationship with Garden Catering, and a jury will have to determine the nature of Natale's duties or the extent, if any, of his agency to determine whether the alleged misconduct was within the scope of Natale's employment and whether such conduct establishes a breach of his fiduciary duty to Garden Catering. *See*

*also Hoffnagle v. Henderson*, No. CV020813972S, 2003 WL 21150549, at *7 (Conn. Super. Ct. Apr. 17, 2003) ("The existence of a fiduciary duty is largely a factual determination and the extent of the duty and the resulting obligations may vary according to the nature of the relationship: the obligations do not arise as a result of labeling, but rather by analysis of each case.").[16]

If Plaintiffs can establish that a fiduciary duty applied to Defendant Natale's obligations while employed, they must also establish that Natale's actions were in breach of this duty. Plaintiffs assert that Defendant Natale breached his fiduciary duty in multiple ways by competing with Garden Catering while he was still employed by Plaintiffs. *First*, Natale's preparations to open Wally's, including signing a lease for a retail space and incorporating the business, were impermissible competition. "In the absence of clear consent or waiver by the principal, an agent, during the term of the

---

[16] This approach is consistent with the Restatement (Third) of Agency, which Connecticut courts generally follow, and the Connecticut Supreme Court's holding in *Taylor*, 149 Conn. at 552. *See Metro. Enter. Corp. v. United Technologies Int'l Corp.*, Civil No. 3:03cv1685 (JBA), 2005 WL 2300382, at *9 (D. Conn. Sept. 21, 2005) ("Connecticut generally appears to follow the Restatement approach to questions of agency law, and, as a federal district court sitting in diversity jurisdiction, this Court predicts that, if presented with this issue, the Connecticut Supreme Court would follow the Restatement [Third] of Agency concerning the duties owed between principals and agents." (internal citations omitted)). The Restatement provides that "[a]ll who assent to act on behalf of another person and subject to that person's control are common-law agents . . . and are subject to the general fiduciary principle stated in this section," but the "[f]iduciary obligation . . . is not monolithic in its operation. In particular, an agent's fiduciary duties to the principal vary depending on the parties' agreement and the scope of the parties' relationship. The scope of an agency relationship can be analyzed by identifying the parties to the relationship, examining whether particular interactions are as principal and agent, and specifying the duration of the relationship." Restatement (Third) Agency § 8.01 cmt. c.

agency, is subject to a duty not to compete with the principal concerning the subject matter of the agency." *Town & Country House & Homes Serv.*, 150 Conn. at 317. However, "in the absence of a restrictive covenant, a former employee may compete with his or her former employer upon termination of employment." *Elm City Cheese Co., Inc. v. Federico*, 251 Conn. 59, 69 (1999).

Nevertheless, even before an employee resigns, he or she is entitled to make preparations to compete with the current employer, as long as actual competition has not yet begun. *See Clinipad Corp. v. Aplicare, Inc.*, No. 235252, 1991 WL 27899, at *7 (Conn. Super. Ct. Jan. 10, 1991); *see also Republic Sys. & Programming, Inc. v. Computer Assistance, Inc.*, 322 F. Supp. 619, 623 (D. Conn. 1970) (employee who prepared incorporation papers for a new, competing business while he still worked for the plaintiff did not breach fiduciary duty to employer). As the undisputed facts do not show a breach of fiduciary duty based solely on Defendant Natale's preparations to compete, Defendants' motion for summary judgment on this part of Count One is granted.

*Second*, Natale's preparation of "a business plan using the same concept and pricing as Garden Catering" and a budget based on its confidential business information, "such as their recipes, pricing, supplier arrangements, and the manner in which the 'Garden Catering' chicken nuggets are prepared and served." (Pls.' Opp'n at 38.) While Natale could lawfully compete with Garden Catering after his employment there ended, "[e]ven after the employment has ceased . . . 'the employee remains subject to a duty not to use trade secrets, or other confidential information, which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of his former employer.'" *Elm City Cheese Co., Inc.*, 251 Conn. at 69 (quoting *Allen Mfg. Co.*

*v. Loika*, 145 Conn. 509, 514 (1958)).  This duty applies even in the absence of a non-competition agreement or confidentiality agreement between the parties.  *See Town & Country House & Homes Serv.*, 150 Conn. at 319 ("The lack of any express agreement on the part of the employee not to disclose a trade secret is not significant.  The law will import into every contract of employment a prohibition against the use of a trade secret by the employee for his own benefit, to the detriment of his employer, if the secret was acquired by the employee in the course of his employment.").

To qualify as a trade secret, information cannot be "[m]atters of public knowledge or of general knowledge in an industry" and "a substantial element of secrecy must exist, to the extent that there would be difficulty in acquiring the information except by the use of improper means."  *Id.* at 318–19.[17]

---

[17] "Some of the factors to be considered in determining whether given information is a trade secret are (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."  *Town & Country House & Homes Serv.*, 150 Conn. at 319.

The process by which a food product is made combined with "certain financial information—including its product pricing structure, and list of suppliers and the prices paid for its supplies" can qualify as a trade secret. *Elm City Cheese Co., Inc.*, 251 Conn. at 70.[18] "The question of whether, in a specific case, a party has made reasonable efforts to maintain the secrecy of a purported trade secret is by nature a highly fact-specific inquiry." *Id.* at 80.

Defendant Natale disputes that Garden Catering's method of preparing chicken nuggets is a trade secret, and offers the declaration of Joe Marini, a former partner in Garden Catering, who now runs his own restaurant. Marini asserts that he currently uses the same methods of food preparation as were used at Garden Catering and that he has "never at any time, either before or after parting company with the Garden Catering organization, undertaken efforts to protect the 'confidentiality' of information regarding the method of preparation of any food item I have sold." (Marini Decl. at 1–2.)

To establish that they held protectable trade secrets, Plaintiffs offer the declaration of Carpenteri, Jr. in which he describes how employees are told to keep certain information confidential and are required to sign confidentiality agreements, how

---

[18] Plaintiffs do not assert a claim under the Connecticut Uniform Trade Secrets Act (CUTSA), but the misappropriation of trade secrets can also form the basis for a breach of fiduciary duty claim. *See Nationwide Mut. Ins. Co. v. Bland*, 399CV2005(RNC), 2003 WL 23354137, at *3 (D. Conn. Mar. 30, 2003) ("In Connecticut, improper use of confidential information can breach the duty of loyalty . . . ."). Additionally, a claim for breach of fiduciary duty could be based on the misappropriation of information that does not qualify as a trade secret. *See id.* ("Though not entitled to trade secret protection under CUTSA, the information . . . may be protected under Connecticut common law. The duty of loyalty prohibiting an agent from disclosing or using the principal's information applies not only to trade secrets, but also to confidential information.")

Garden Catering keeps private its preparation methods for its chicken nuggets and prepares them out of public view, and its confidentiality agreements with its suppliers, covering information such as pricing terms.  (Carpenteri, Jr. Decl. ¶¶ 18–21.)  Given that there is a genuine dispute of material fact regarding the extent to which Garden Catering's food preparation and other business information were trade secrets and whether Natale wrongfully used this information in his new venture, Defendants' motion for summary judgment on this part of Count One is denied.

Third, Plaintiffs contend that Defendant Natale recruited Zuniga and Pittocco to leave Garden Catering and come join Wally's while Defendant Natale was still employed by Garden Catering.  (Pls.' Opp'n at  35–38.)  "It violates the duty of loyalty to encourage or arrange for fellow employees to work for a competitor or rival business one intends to establish while still working for a company that will be subjected to the competition," Advanced Arm Dynamics of New England LLC v. Comprehensive Prosthetic Servs. LLC, No. CV 06-5004605S, 2011 WL 677475, at *7 (Conn. Super. Ct. Feb. 23, 2011); see also Larsen Chelsey Realty Co. v. Larsen, 232 Conn. 480, 485 (1995).  Although Wally's admits that it currently employs two former Garden Catering employees, Zuniga and Pittocco (see Wally's Admis. ¶¶ 30–31), it denies that Zuniga was recruited to work at Wally's while Defendant Natale was still an employee of Garden Catering (see Natale Admis. ¶ 41).  According to Carpenteri, Sr.'s declaration, however, both Zuniga and Defendant Natale were employed by Garden Catering at the time of Zuniga's recruitment.

(Carpenteri, Sr. ¶ 35.)   Given this contradictory evidence on this critical element, Defendant's motion for summary judgment on this part of Count One is denied.[19]

> 2.    *Common Law Unfair Competition and CUTPA*
>        *(Counts Three and Four)*[20]

"CUTPA, by its own terms, applies to a broad spectrum of commercial activity." *Larsen*, 232 Conn. at 492.  The operative provision of the act, § 42–110b(a), states that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Generally, the trade or commerce requirement excludes from the ambit of CUTPA conduct solely within the employer-employee relationship, but if an employee acts outside the scope of his employment as a competitor, a CUTPA claim can lie.  *See Larsen*, 232 Conn. at 493–94 ("[T]his case presents a fact pattern that involves a potentially viable cause of action under CUTPA because Larsen's allegedly tortious conduct was outside the scope of his employment

---

[19] Although the one-hundred mile distance between Wally's and Garden Catering may limit the extent to which the two restaurants are actually in direct competition, Plaintiffs' alleged injury is not only from direct competition but also from the loss of its employees and the use of its trade secrets without compensation.  *See* Restatement (Third) Of Agency § 8.05 (2006) ("An agent who has possession of property of the principal has a duty to use it only on the principal's behalf . . . .  An agent is subject to this duty whether or not the agent uses property of the principal to compete with the principal or causes harm to the principal through the use." (internal citations omitted)).

[20] Plaintiffs assert that "[t]he same facts that support a finding of liability pursuant to Section 43(a) of the Lanham Act also support a finding of unfair competition under Connecticut common law and are a violation of CUTPA" (Pls.' Opp'n at 11 n.6).  To the extent that the misconduct alleged in Counts Three through Five is based on the fact of trademark infringement, they can't survive summary judgment because the trademark infringement claims have been dismissed for the reasons discussed *supra*.  Plaintiffs do not explain how, if at all, their common law unfair competition and CUTPA claims differ.

relationship with the plaintiff.  The plaintiff contends, in short, that Larsen accepted a job with a competing real estate broker and then, acting as a competitor, took actions that harmed the plaintiff.").  Accordingly, the same conduct that could form the basis for a breach of fiduciary duty claim could also support a CUTPA violation.  *See Ostrowski*, 243 Conn. at 378 ("If the retrial results in findings of violations of fiduciary duty, the question remains whether such misconduct constitutes an unfair and deceptive trade practice within the meaning of CUTPA.").

Defendants' motion for summary judgment on Counts Three and Four is denied.

### 3.    Unjust Enrichment (Count Five)

"Unjust enrichment applies wherever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract.  A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another."  *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*, 231 Conn. 276, 282 (1994) (internal citations omitted).  Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment.  *Id.*

Although there was no contract between Plaintiffs and Defendants, the basis for Plaintiff's unjust enrichment claim is that Defendants have wrongfully appropriated from them without compensation confidential business information—including recipes, food

preparation methods, supplier arrangements, business plans, and trade secrets—for which they should have had licensees to obtain.   (*See* Carpenteri, Sr. Dec. ¶¶ 22, 38–39.) According to Plaintiffs, this business information is valuable property, and they derive substantial revenue from licensing it to franchisees.  (*See id.* ¶ 14.)  Such conduct could form the basis for an unjust enrichment claim, *see Sidney v. DeVries*, 215 Conn. 350, 352 n.1 (1990) ("[U]njust enrichment" is a "common law principle[] of restitution . . . by which a party may recover despite the absence of a valid contract."), but as discussed above, there remain disputed issues of fact regarding whether Defendants have taken Plaintiffs' trade secrets.   Accordingly, Defendants' motion for summary judgment on Count Five is denied.

### III.    Conclusion

For the reasons set forth above, Defendants' Motion [Doc. # 68] for Summary Judgment is GRANTED in part and DENIED in part as to Count One; GRANTED as to Count Two; and DENIED as to Counts Three through Five.


IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 28th day of February, 2014.